George FOURNIER, Petitioner,

v.

Bert ROED, Ramsey County Sheriff, and Neil Thompson, Ramsey County State's Attorney, Respondents.

Cr. 367.

Supreme Court of North Dakota.

Sept. 24, 1968.

Leo Broden, Devils Lake, and Costello, Porter, Hill, Banks & Nelson, Rapid City, S. D., for petitioner.

Neil Thompson, State's Atty., and Thomas E. Rutten, Asst. State's Atty., Devils Lake, for respondents.

John B. Hart, State's Atty., of Rolette County, Rolla, amicus curiae.

ERICKSTAD, Judge (on reassignment).

George Fournier, an Indian and an enrolled member of the Devils Lake Sioux Tribe, was arrested without a warrant on February 3, 1968, within the exterior boundaries of the Fort Totten Indian Reservation by a deputy sheriff of Ramsey County. The reservation lies within Benson County but is adjacent to Ramsey County. Immediately after arresting Mr. Fournier the deputy sheriff transported him to the Ramsey County jail.

On the same date a complaint was filed with the County Justice of Ramsey County, charging Mr. Fournier with the commission of the crime of larceny of an automobile, a felony under our law; and thereupon the county justice set a preliminary hearing for February 7. Later the case was continued to February 10, when a preliminary hearing was commenced and evidence was presented for the purpose of determining whether a public offense had been committed, and, if so, whether there was sufficient cause to believe that Mr. Fournier had committed it.

At the close of the testimony Mr. Fournier moved for dismissal of the criminal complaint on the ground that the Ramsey County law enforcement officer had exceeded his jurisdiction by making the arrest on the Indian reservation and thus the arrest was illegal, justifying Mr. Fournier's release.

As Mr. Fournier on February 9 had sought a writ of habeas corpus from the District Court of Ramsey County and that court on February 10 had issued a writ of habeas corpus commanding the Sheriff of Ramsey County to bring Mr. Fournier before the court on February 14 for a determination of his application for his release through a writ of habeas corpus, the county justice postponed making any decision on the motion, and, as far as our record discloses, has not yet determined whether a public offense was committed, and, if so, whether there is probable cause to believe that Mr. Fournier committed it.

Following the hearing on February 14, the district judge, the Honorable Douglas B. Heen, rendered his memorandum decision, setting forth his reasons for denying Mr. Fournier's release and for quashing the writ. There is no provision under our law for appeal from this decision; accordingly, pursuant to § 87 of our constitution, the petitioner has now filed with our court a petition for a writ of habeas corpus, praying for his release upon the same grounds asserted in the district court.

Although the scope of the inquiry in an application to this court for a writ of habeas corpus was not made an issue by the petitioner or by the State, our court has struggled much with this question. One view apparently is that if the trial court has jurisdiction, in a narrow sense, of the

offense and of the person of the defendant, habeas corpus will not lie for his discharge, notwithstanding that the Constitution or laws or treaties of the United States may have been violated in the taking into custody of the petitioner.

■ In light of the development of the law surrounding the Great Writ, as set forth in Fay v. Noia, 372 U.S. 391, 83 S. Ct. 822, 9 L.Ed.2d 837 (1963), by Justice Brennan for the majority and by Justice Harlan for the minority, it is the opinion of the majority of this court that the scope of the inquiry in an application to this court for a writ of habeas corpus is much broader than that expressed above when the application is based upon grounds asserting that the petitioner has been illegally restrained of his liberty in violation of the Constitution or laws or treaties of the United States.

In *Fay* Justice Brennan, speaking for the majority, said:

Nor is it true that at common law habeas corpus was available only to inquire into the jurisdiction, in a narrow sense, of the committing court. Bushell's Case is again in point. Chief Justice Vaughan did not base his decision on the theory that the Court of Oyer and Terminer had no jurisdiction to commit persons for contempt, but on the plain denial of due process, violative of Magna Charta, of a court's imprisoning the jury because it disagreed with the verdict:

" * * * [W]hen a man is brought by Habeas Corpus to the Court, and upon retorn of it, it appears to the Court, That he was against Law imprison'd and detain'd, * * * he shall never be by the Act of the Court remanded to his unlawful imprisonment, for then the Court should do an act of Injustice in imprisoning him, de novo, against Law, whereas the great Charter is Quod nullus libet homo imprisonetur nisi per legem terrae; This is the present case, and this was the case upon all the Presidents

[precedents] produc'd and many more that might be produc'd, where upon Habeas Corpus, many have been discharg'd * * *.

"This appears plainly by many old Books, if the Reason of them be rightly taken, For insufficient causes are as no causes retorn'd; and to send a man back to Prison for no cause retorn'd, seems unworthy of a Court." Vaughan, at 156, 124 Eng.Rep., at 1016, 9 Howell's State Trials, at 1023.

To the same effect, we read in Bacon's Abridgment:

"[I]f the commitment be against law, as being made by one who had no jurisdiction of the cause, *or for a matter for which by law no man ought to be punished,* the court are to discharge him * * *; and the commitment is liable to the same objection where the cause is so loosely set forth, that the court cannot adjudge *whether it were a reasonable ground of imprisonment or not.*"

Thus, at the time that the Suspension Clause was written into our Federal Constitution and the first Judiciary Act was passed conferring habeas corpus jurisdiction upon the federal judiciary, there was respectable common-law authority for the proposition that habeas was available to remedy any kind of governmental restraint contrary to fundamental law. * * * (footnote omitted)

Fay v. Noia, 372 U.S. 391, 404–405, 83 S.Ct. 822, 830, 9 L.Ed.2d 837.

Emphasizing the breadth of the Great Writ, Justice Brennan continued:

Furthermore, our decision today affects all procedural hurdles to the achievement of swift and imperative justice on habeas corpus * * *.

Fay v. Noia, supra, 372 U.S. 391, 435, 83 S.Ct. 822, 847.

Justice Harlan dissented from the majority opinion in *Fay* because he believed

that the state conviction on which Noia's detention was based rested on an adequate and independent non-federal ground, that ground being that the relevant facts concerning the claim of a coerced confession were reasonably available and yet Noia had allowed the time for a direct appeal to lapse without seeking a review by the state appellate court. However, Justice Harlan and those who joined him in his dissent agreed that there had been considerable development of the law of habeas corpus. He pointed out that during the pre-1915 period the federal courts, in considering applications for habeas corpus which complained of detention pursuant to a judgment of conviction and sentence, purported to examine only the jurisdiction of the sentencing tribunal. We quote:

In the leading case of Ex parte Watkins, 3 Pet. 193, 7 L.Ed. 650, the Court stated:

"An imprisonment under a judgment cannot be unlawful, unless that judgment be an absolute nullity; and it is not a nullity if the court has general jurisdiction of the subject, although it should be erroneous." 3 Pet. at 203.

Many subsequent decisions, dealing with both state and federal prisoners, and involving both original applications to this Court for habeas corpus and review of lower court decisions, reaffirmed the limitation of the writ to consideration of the sentencing court's jurisdiction over the person of the defendant and the subject matter of the suit. (citations omitted)

Fay v. Noia, supra, 372 U.S. 391, 450, 83 S.Ct. 822, 854 (dissenting opinion of Harlan, J.)

He discussed the broadening of the writ during the 1915–53 period beginning with Frank v. Mangum, 237 U.S. 309, 35 S.Ct. 582, 59 L.Ed. 969 (1915):

It is clear that a new dimension was added to habeas corpus in this case [*Frank*], for in addition to questions previously thought of as "jurisdictional," the federal courts were now to consider whether the applicant had been given an adequate opportunity to raise his constitutional claims before the state courts. And if no such opportunity had been afforded in the state courts, the federal claim would be heard on its merits. * * *

Fay v. Noia, supra, 372 U.S. 391, 456, 83 S.Ct. 822, 858 (dissenting opinion of Harlan, J.)

He described a further stage of expansion of the writ which began with Brown v. Allen, 344 U.S. 443, 73 S.Ct. 397, 97 L. Ed. 469 (1953):

In 1953, this Court rendered its landmark decisions in Brown v. Allen, 344 U.S. 443, 73 S.Ct. 397, 97 L.Ed. 469, and Daniels v. Allen, reported therewith, 344 U.S., at 482–487, 73 S.Ct. at 420–422. Both cases involved applications for federal habeas corpus by prisoners who were awaiting execution pursuant to state convictions. In both cases, the constitutional contentions made were that the trial court had erred in ruling confessions admissible and in overruling motions to quash the indictment on the basis of alleged discrimination in the selection of jurors.

In *Brown*, these contentions had been presented to the highest court of the State, on direct appeal from the conviction, and had been rejected by that court on the merits, State v. Brown, 233 N.C. 202, 63 S.E.2d 99, after which this Court had denied certiorari, 341 U.S. 943, 71 S.Ct. 997, 95 L.Ed. 1369. At this point, the Court held, Brown was entitled to full reconsideration of these constitutional claims, with a hearing if appropriate, in an application to a Federal District Court for habeas corpus.

It is manifest that this decision substantially expanded the scope of inquiry on an application for federal habeas corpus. Frank v. Mangum and Moore v.

Dempsey [261 U.S. 86, 43 S.Ct. 265, 67 L.Ed. 543] had denied that the federal courts in habeas corpus sat to determine whether errors of law, even constitutional law, had been made in the original trial and appellate proceedings. Under the decision in *Brown*, if a petitioner could show that the validity of a state decision to detain rested on a determination of a constitutional claim, and if he alleged that determination to be erroneous, the federal court had the right and the duty to satisfy itself of the correctness of the state decision. (footnotes omitted)

Fay v. Noia, supra, 372 U.S. 391, 460–461, 83 S.Ct. 860 (dissenting opinion of Harlan, J.)

In light of the law of the writ as it has developed, we must inquire in this case into whether the detention of the petitioner has violated the Constitution or the laws or the treaties of the United States in such a way that he is being restrained in violation of fundamental law, entitling him to his release through a writ of habeas corpus. Fay v. Noia, supra, 372 U.S. 391, 411–412, 83 S.Ct. 822.

This is the view that the federal courts are required to take by the federal habeas corpus statute, which provides, among other things, that the writ of habeas corpus shall not extend to a prisoner unless he is in custody in violation of the Constitution or laws or treaties of the United States. 28 U.S.C.A. § 2241(c) (3).

If we were to take a more limited view of the scope of our inquiry on an application for a writ of habeas corpus, our decisions would not meet the crucial federal issues, and thus our proceedings would merely be a delay en route to the federal courts, where those issues would ultimately be met and decided.

In this view, then, we must analyze the petitioner's contentions which are grounded in federal law, upon which he hopes he may gain his freedom through the writ of habeas corpus.

N.D.C.C. § 29–06–15(3) permits a peace officer to make an arrest without a warrant when a felony in fact has been committed and the officer has reasonable cause to believe the person arrested committed it. Federal law is to the same effect. See U.S. C.A. tit. 18, §§ 3052 (powers of Federal Bureau of Investigation), 3053 (powers of marshals and deputies), and other federal statutes setting forth the powers of law enforcement officials.

There is no contention in this case that a felony was not committed or that the officer did not have reasonable grounds to believe that the petitioner committed it. Therefore, the crucial issue is whether the arrest of the petitioner, an Indian, on the reservation by a deputy sheriff of a county adjacent to the reservation for a felony committed in that county deprived the petitioner of his rights under the Constitution or the laws or the treaties of the United States, so that he is entitled to be released from custody.

The petitioner contends that through the disclaimer clauses of the Enabling Act under which North Dakota was admitted to the Union and of the Constitution of the State of North Dakota, the deputy sheriff was prevented from arresting him on the reservation.

The pertinent section of the Enabling Act reads:

4. * * * And said convention shall provide by ordinances irrevocable without the consent of the United States and the people of said states: * * *

Second. That the people inhabiting said proposed states do agree and declare that they forever disclaim all right and title to the unappropriated public lands lying within the boundaries thereof, and to all lands lying within said limits owned or held by any Indian or Indian tribes; and that until the title thereto shall have been extinguished by the United States, the same shall be and remain subject to the disposition of the United States, and said Indian lands shall remain under the

absolute jurisdiction and control of the congress of the United States; * * *.

The pertinent part of our state constitution originally read:

## ARTICLE XVI

## COMPACT WITH THE UNITED STATES

The following article shall be irrevocable without the consent of the United States and the people of this state:

Section 203. * * *

Second. The people inhabiting this state do agree and declare that they forever disclaim all right and title to the unappropriated public lands lying within the boundaries thereof, and to all lands lying within said limits owned or held by any Indian or Indian tribes, and that until the title thereto shall have been extinguished by the United States, the same shall be and remain subject to the disposition of the United States, and that said Indian lands shall remain under the absolute jurisdiction and control of the congress of the United States; * * *.

In 1953 Congress enacted Public Law 83–280, which, in addition to conferring jurisdiction on certain enumerated states of criminal offenses and civil causes of action committed on or arising on Indian reservations within such states, gave the consent of the United States to the people of any state to amend their state constitutions and existing statutes to remove any legal impediment to the assuming of civil and criminal jurisdiction in accordance with the provisions of the Act. It provided in part:

Sec. 6. Notwithstanding the provisions of any Enabling Act for the admission of a State, the consent of the United States is hereby given to the people of any State to amend, where necessary, their State constitution or existing statutes, as the case may be, to remove any legal impediment to the assumption of civil and criminal jurisdiction in accord-

ance with the provisions of this Act: *Provided,* That the provisions of this Act shall not become effective with respect to such assumption of jurisdiction by any such State until the people thereof have appropriately amended their State constitution or statutes as the case may be.

Sec. 7. The consent of the United States is hereby given to any other State not having jurisdiction with respect to criminal offenses or civil causes of action, or with respect to both, as provided for in this Act, to assume jurisdiction at such time and in such manner as the people of the State shall, by affirmative legislative action, obligate and bind the State to assumption thereof.

Act of Aug. 15, 1953, Pub. L. No. 83–280, §§ 6, 7, 67 Stat. 588.

In 1958 the people of North Dakota approved an amendment of the second part of § 203 of our state constitution. The part of that amendment that relates to this case reads:

The people inhabiting this state do agree and declare that they forever disclaim all right and title to the unappropriated public lands lying within the boundaries thereof, and to all lands lying within said limits owned or held by any Indian or Indian tribes, and that until the title thereto shall have been extinguished by the United States, the same shall be and remain subject to the disposition of the United States, and that said Indian lands shall remain under the absolute jurisdiction and control of the Congress of the United States, *provided, however, that the Legislative Assembly of the state of North Dakota may, upon such terms and conditions as it shall adopt, provide for the acceptance of such jurisdiction as may be delegated to the state by act of Congress; * * *.* (emphasis added)

Laws of North Dakota 1959, ch. 430.

The change that was made in § 203 is the part we have italicized, the provision permitting the legislative assembly to pro-

vide for acceptance by the State of jurisdiction over Indian lands.

Pursuant to Senate Concurrent Resolution "RR" and House Concurrent Resolution "T-1" of the Thirty-seventh Legislative Assembly (1961), the Legislative Research Committee made a study of the field of Indian affairs. The committee recommended that the state not assume criminal jurisdiction over Indian reservations, giving as reasons (1) the objection to such jurisdiction by substantial numbers of Indian citizens and (2) the costs. In making this recommendation the committee said:

Since the Committee does not recommend the assumption of criminal jurisdiction over Indian reservations because of the objection by substantial numbers of Indian citizens and because of the costs involved, the present morass of complex legal questions in the criminal field will continue to plague the Federal Government, the U. S. Bureau of Indian Affairs, the State of North Dakota and its political subdivisions, tribal governments, reservation residents, and citizens at large. * * *

Report of the North Dakota Legislative Research Committee, Thirty-eighth Legislative Assembly (1963), at 39.

In 1963 our state legislature, proclaiming that it was acting in accordance with the provisions of Public Law 280 of the 83d Congress and § 203 of the North Dakota Constitution, enacted Senate Bill 30, which provided, among other things, for the method of acceptance of civil jurisdiction on reservations, including a method of acceptance by an individual as well as by a tribe. Laws of North Dakota 1963, ch. 242 (now N.D.C.C. ch. 27–19). Neither that session of the legislature nor any subsequent session has acted to provide for the assumption of criminal jurisdiction on reservations.

In April 1968 Congress passed the Civil Rights Act, Title IV of which provided in part:

Sec. 401. (a) The consent of the United States is hereby given to any State not having jurisdiction over criminal offenses committed by or against Indians in the areas of Indian country situated within such State to assume, with the consent of the Indian tribe occupying the particular Indian country or part thereof which could be affected by such assumption, such measure of jurisdiction over any or all of such offenses committed within such Indian country or any part thereof as may be determined by such State to the same extent that such State has jurisdiction over any such offense committed elsewhere within the State, and the criminal laws of such State shall have the same force and effect within such Indian country or part thereof as they have elsewhere within that State.

Act of Apr. 11, 1968, Pub. L. No. 90–284.

Section 402 of the Act relates to civil jurisdiction, and Section 403(b) repealed Section 7 of Public Law 83–280 (Act of Aug. 15, 1953), 67 Stat. 588.

■ The petitioner argues that as the legislature did not act to assume criminal jurisdiction over Indian country, the arrest in this case was illegal and void, and thus his detention is illegal.

Although the legislature did not specifically authorize the arrest of an Indian on a reservation, for an offense committed off the reservation, by a peace officer of a county adjacent to that in which the Indian land is situated, we note that the legislature intended in Senate Bill 30 of the 1963 session to give the courts of this state such power over Indian country as would permit the courts to maintain their dignity and enforce their orders. This power was contained in § 7 of Senate Bill 30 and reads:

In addition to other authority conferred by this Act, the courts of this state shall have the power to hold persons in civil or criminal contempt of court in order to maintain the dignity of the courts and enforce their orders.

Laws of North Dakota 1963, ch. 242 (now N.D.C.C. § 27–19–07).

Although in this instance there is no civil or criminal contempt, what is involved is whether the state courts will be able to be effective in performing their function, or whether they will become helpless when an offense is committed off the reservation by an Indian who escapes to the reservation before he is apprehended.

Is the State, through its failure to assume full criminal jurisdiction on Indian reservations, now to be deprived of the exercise of its sovereign power of the enforcement of law and order within its boundaries outside the Indian reservations?

Because law and order are at stake, and the objective of law and order is justice for all, we will not infer a prohibition against the exercise of this power by the State but will require that we be shown that the State is prohibited from exercising such power by some specific provision of the Constitution or laws or treaties of the United States before we will hold that the State does not have such power. This we have not been shown.

None of the decisions which have been referred to us by the petitioner concerns the specific issue which we have before us, and thus they are of little aid to us in determining that issue. The reason that no such decision has been referred to us could be that no one has ever before thought to question a power which is so fundamental to the preservation of the state.

The decision referred to us by the petitioner as supporting his position which most closely resembles this case in facts and issue is In the Matter of the Application for a Writ of Habeas Corpus of Wayne Turtle, Sr., an unreported case of the United States District Court for the State of Arizona. We have reviewed the papers left with us, which purport to be the briefs filed by the respective parties

and the order of the federal district court requiring the petitioner's release. The order does not set forth the reasoning of the court and thus is of no value to us.

One of the cases referred to us by the petitioner and designated as a landmark case is that of Worcester v. Georgia, decided by the United States Supreme Court in the year 1831. That case concerned a prosecution by the State of Georgia of a white citizen of Vermont who had gone onto the Cherokee Indian Reservation in Georgia with the apparent consent of the Cherokee Indians but without a license or permit from the Governor of Georgia as required by Georgia law. In reversing the judgment of conviction of the petitioner and ordering his release, the Supreme Court, speaking through Chief Justice Marshall, said:

> The Cherokee nation, then, is a distinct community, occupying its own territory, with boundaries accurately described, in which the laws of Georgia can have no force, and which the citizens of Georgia have no right to enter, but with the assent of the Cherokees themselves, or in conformity with treaties and with the acts of congress. The whole intercourse between the United States and this nation is, by our constitution and laws, vested in the government of the United States.

Worcester v. Georgia, 10 U.S. (6 Pet.) 214, 243, 8 L.Ed. 483 (1831).

In writing this opinion, Chief Justice Marshall discussed the policy of the United States in Indian affairs before the adoption of the Constitution and how such affairs were considered by the early settlers. In addition, he pointed out that through the United States Constitution, the regulation of commerce among the Indian tribes was given to Congress. In deciding the case, however, he seemed to place the most importance on the various treaties that had been entered into between the Cherokees and the United States. In dis-

cussing the significance of the treaties, he said:

What is a treaty? The answer is, it is a compact formed between two nations or communities, having the right of self-government.

Is it essential that each party shall possess the same attributes of sovereignty, to give force to the treaty? This will not be pretended: for, on this ground, very few valid treaties could be formed. The only requisite is, that each of the contracting parties shall possess the right of self-government, and the power to perform the stipulations of the treaty.

Worcester v. Georgia, supra, 10 U.S. (6 Pet.) 214, 260.

We think it is noteworthy that Chief Justice Marshall believed that there could be a change through an evolutionary process in the relationship between victor and vanquished or between two nations or communities that have entered into treaties. We quote:

Every state is more or less dependent on those which surround it; but, unless this dependence shall extend so far as to merge the political existence of the protected people into that of their protectors, they may still constitute a state. They may exercise the powers not relinquished, and bind themselves as a distinct and separate community.

Worcester v. Georgia, supra, 10 U.S. (6 Pet.) 214, 261.

In the instant case we have been referred to no pertinent treaties between the Sioux Indians and the United States Government, and thus we do not have treaties to guide us.

The status of the Indian in North Dakota has changed considerably since statehood, the most important change, we believe, being the amendment of our state constitution which now gives the Indian the full status of citizenship, entitling him to an equal vote with all other citizens of the state. Section 121 of Article V of the North Dakota Constitution, which originally extended the franchise to no Indians except those who were male and who had severed their tribal relations two years earlier, has since 1958 given it to "every person of the age of twenty-one or upwards who is a citizen of the United States and who shall have resided in the state one year and in the county ninety days and in the precinct thirty days next preceding any election." This amendment evinces an attitude on the part of the other people of North Dakota to accept Indians as equals. With civic rights go responsibilities, including the responsibility of obeying the laws of the state as they are in effect outside the reservation.

Another case referred us by the petitioner is that of Organized Village of Kake v. Egan, decided by the United States Supreme Court in 1962. In it Justice Frankfurter, speaking for the court, said:

The general notion drawn from Chief Justice Marshall's opinion in Worcester v. Georgia, 6 Pet. 515, 561, 8 L.Ed. 483; The Kansas Indians, 5 Wall. 737, 755–757, 18 L.Ed. 667; and The New York Indians, 5 Wall. 761, 18 L.Ed. 708, that an Indian reservation is a distinct nation within whose boundaries state law cannot penetrate, has yielded to closer analysis when confronted, in the course of subsequent developments, with diverse concrete situations. By 1880 the Court no longer viewed reservations as distinct nations. On the contrary, it was said that a reservation was in many cases a part of the surrounding State or Territory, and subject to its jurisdiction except as forbidden by federal law, Utah & Northern R. Co. v. Fisher, 116 U.S. 28, 31, 6 S.Ct. 246, 247, 29 L.Ed. 542. In Langford v. Monteith, 102 U.S. 145, 26 L.Ed. 53, the Court held that process might be served within a reservation for a suit in territorial court between two non-Indians. In United States v. McBratney, 104 U.S. 621, 21 S.Ct. 924, 45

L.Ed. 1032, and Draper v. United States, 164 U.S. 240, 17 S.Ct. 107, 41 L.Ed. 419, the Court held that murder of one non-Indian by another on a reservation was a matter for state law. (footnote omitted)

Organized Village of Kake v. Egan, 369 U.S. 60, 72–73, 82 S.Ct. 562, 569, 7 L.Ed. 2d 573 (1962).

Justice Frankfurter quoted Williams v. Lee, another recent decision of the United States Supreme Court, setting forth the rule of applicability of state law to Indian reservations:

In the latest decision, Williams v. Lee, 358 U.S. 217, 79 S.Ct. 269, 3 L.Ed.2d 251, we held that Arizona had no jurisdiction over a civil action brought by a non-Indian against an Indian for the price of goods sold the latter on the Navajo Reservation. The applicability of state law, we there said, depends upon "whether the state action infringed on the right of reservation Indians to make their own laws and be ruled by them," 358 U.S., at 220, 79 S.Ct. at 271. Another recent statement of the governing principle was made in a decision reaffirming the authority of a State to punish crimes committed by non-Indians against non-Indians on reservations: "[I]n the absence of a limiting treaty obligation or Congressional enactment each state had a right to exercise jurisdiction over Indian reservations within its boundaries," New York ex rel. Ray v. Martin, 326 U.S. 496, 499, 66 S.Ct. 307, 308, 90 L.Ed. 261.

These decisions indicate that even on reservations state laws may be applied to Indians unless such application would interfere with reservation self-government or impair a right granted or reserved by federal law. * * *

Organized Village of Kake v. Egan, supra, 369 U.S. 60, 74–75.

The arrest made by the deputy sheriff of Ramsey County, even though it was made in Benson County, was proper under our law. As a private person may, under N.D.C.C. § 29–06–20(3), arrest another when a felony has in fact been committed and he has reasonable ground to believe that the person arrested committed it, certainly a peace officer has the same power. People v. McCarty, 164 Cal.App.2d 322, 330 P.2d 484, 488 (1958).

Applying the principle stated by Justice Frankfurter to our case, we believe that our law should apply, as the arrest did not interfere with the reservation self-government nor impair any right granted or reserved to the petitioner by federal law or treaty.

The foregoing discussion disposes of the federal grounds asserted by the petitioner as justifying his release on a writ of habeas corpus.

In addition to the federal grounds, however, the petitioner asserts what he believes to be a state ground for his release under a writ of habeas corpus. That ground is that his detention is illegal because he was not taken upon his arrest without a warrant on the reservation, which is situated in Benson County, to a magistrate in that county but instead was taken to a magistrate in the adjacent county of Ramsey, where the offense was triable.

In determining whether a writ of habeas corpus based upon state grounds should be granted, N.D.Const. § 87 and N.D.C.C. ch. 32–22 must be considered:

Section 87. It [the Supreme Court] shall have power to issue writs of habeas corpus, mandamus, quo warranto, certiorari, injunction and such other original and remedial writs as may be necessary to the proper exercise of its jurisdiction, and shall have authority to hear and determine the same; provided, however, that no jury trial shall be allowed in said supreme court, but in proper cases questions of fact may be sent by said court to a district court for trial.

North Dakota Constitution.

The sections of ch. 32–22 pertinent to this issue follow:

32–22–16. When person restrained must be discharged.—If no legal cause is shown for the imprisonment or restraint or for the continuation thereof, the court must discharge the party from the custody or restraint under which he is held.

32–22–17. Causes for discharge of person restrained.—If it appears on the return of the writ that the party is in custody by virtue of process from any court of this state, or any judge or officer thereof, such person may be discharged in any of the following cases, subject to the restrictions of section 32–22–02:

1. When the jurisdiction of such court or officer has been exceeded;

2. When the imprisonment was at first lawful, but by some act, omission, or event which has taken place afterward, the party has become entitled to a discharge;

3. When the process is defective in some matter of substance required by law rendering such process void;

4. When the process, though regular in form, has been issued in a case not allowed by law;

5. When the person having the custody of the party is not the person allowed by law to detain him;

6. When the process is not authorized by any order or judgment of any court nor by any provisions of law;

7. When a party has been committed on a criminal charge without reasonable or probable cause; or

8. When the process appears to have been obtained by false pretense or bribery.

North Dakota Century Code.

We shall examine the petitioner's claim in light of subsection 2. Having previously decided herein that the arrest was legal, we must now determine whether by some act, omission, or event which has taken place after the arrest, the petitioner has become entitled to his discharge.

The part of our code pertinent to this question reads:

29–06–25. Procedure against person arrested without warrant.—When an arrest is made by a peace officer or a private person without a warrant, the person arrested without unnecessary delay must be taken:

1. Before the nearest or most accessible magistrate in the county where the arrest is made;

2. If there is no magistrate in said county qualified to act, then before the nearest or most accessible magistrate authorized to act for the county where the arrest is made.

A complaint stating the charge against the person arrested must be made before such magistrate, as is provided in section 29–05–04.

North Dakota Century Code.

This issue was also raised by the petitioner in his application to the District Court of Ramsey County for a writ of habeas corpus. In quashing the writ which he had previously issued, the district judge acknowledged that there is authority that a statute providing that a prisoner shall be taken before a designated magistrate is mandatory, but held that the better rule is that nonconformance with such a requirement does not render the arrest illegal. In support of his decision the judge cited People v. McCarty, supra.

In *McCarty* the defendant was arrested without a warrant in Los Angeles County by an officer from Ventura County, who took the defendant before a magistrate in Ventura County. In discussing this issue

the District Court of Appeal pointed out the conflict under California law at the time of McCarty's arrest:

It appearing that after his arrest defendant was taken before a magistrate in Ventura County, the further contention is made that the arrest was rendered unlawful *ab initio* by the failure of the arresting officer promptly to take defendant before the nearest or most accessible magistrate in the county in which the arrest was made, as required by provisions of section 849 Penal Code then in effect. Prior to its amendment in 1957, section 849 appeared to be in conflict with section 145 of the same code. Under section 145 the arresting officer is guilty of a misdemeanor if he delays taking the arrested person before a magistrate having jurisdiction to take his examination. Under Article I, Section 8, of the California Constitution, only a magistrate in the county in which the offense charged is triable has jurisdiction to take the examination. This apparent conflict was eliminated by the 1957 amendment to section 849, which requires the arrested person to be taken before a magistrate in the county *in which the offense is triable.*

People v. McCarty, 164 Cal.App.2d 322, 330 P.2d 484, 488 (1958).

We have no such conflict under our law.

Notwithstanding that the California law required (as does ours) that a person arrested without a warrant be taken before the nearest or most accessible magistrate of the county in which the arrest is made, the court concluded that the arrest was legal:

But assuming, *arguendo*, that the officer's conduct in taking defendant before the Ventura County magistrate was unlawful, it would not follow that either the antecedent arrest or the search and seizure incidental thereto were .illegal. There is nothing in the circumstances here shown to provide any basis for the application of the exclusionary rule of People v. Cahan, 44 Cal.2d 434, 282 P.2d 905, 50 A.L.R.2d 513. Unlawful activity which does not produce the evidence sought to be suppressed and which is entirely unrelated and collateral to the securing of such evidence affords no basis for applying a rule of exclusion. (citations omitted)

People v. McCarty, supra, 488.

For the reasons hereafter stated we concur with the District Court of ·Ramsey County in its conclusion that the failure of the officer to take the petitioner before the magistrate of Benson County does not justify his release on a writ of habeas corpus.

Two sections of our code seem pertinent to the discussion of this issue. They read:

29–05–17. Requirements of warrant for accused from other county—Complaint to accompany.—Whenever there is laid before a magistrate a complaint of the commission of a crime or public offense triable in another county of this state, but showing that the accused is in the county where the complaint is laid, the proceedings prescribed in this chapter must be had, except that the warrant must require the accused to be taken before the nearest and most accessible magistrate of the county in which the offense is triable, and the complaint, with the depositions, if any, of the witnesses who may have been produced, must be delivered by the magistrate issuing the warrant to the officer to whom the warrant is delivered.

29–05–18. Accused taken to proper county—Delivery with him of complaint—Depositions.—The officer who executes a warrant for an offense triable in another county must take the accused before the nearest or most accessible magistrate of the county in which the offense is triable and must deliver to him the complaint and the depositions, if any, and the warrant, with his return en-

dorsed thereon, and the magistrate then must proceed in the same manner as upon a warrant issued by himself.

North Dakota Century Code.

If the deputy sheriff of Ramsey County had laid before the magistrate of Benson County, in which the reservation is situated, a complaint that the petitioner had committed the felony in Ramsey County, while showing that the petitioner was in the county where the complaint was laid, the magistrate of Benson County, had he found from an examination of the complainant reasonable ground to believe that the offense had been committed and that the petitioner had committed it, would have had to issue a warrant requiring the petitioner to be taken before the nearest and most accessible magistrate of the county in which the offense was triable, namely, Ramsey County.

There being no contention that the deputy sheriff did not have reasonable grounds to believe that the offense charged had not been committed by the petitioner, it is logical to assume that had a complaint been properly laid before the magistrate of Benson County, the magistrate would have had reasonable grounds to believe that the offense had been committed and that the petitioner had committed it.

The record discloses that a preliminary hearing has been held, and accordingly it is now the duty of the magistrate of Ramsey County to determine whether there is probable cause to believe that the offense charged has been committed by the petitioner.

N.D.C.C. § 29-07-18, relating to the magistrate's duty in a preliminary hearing, provides in part that after hearing the evidence on behalf of the respective parties, the magistrate must determine whether a public offense has been committed and whether there is sufficient cause to believe the defendant guilty thereof. Unless the magistrate finds that a public offense has been committed and that there is sufficient cause to believe that the defendant com-

mitted it, he must order the defendant discharged. We need not determine at this time what the result would be were the magistrate to find that a misdemeanor rather than a felony was committed, both being public offenses.

We therefore believe the error was without prejudice to the petitioner and was not such as would justify his release.

For the reasons stated the writ of habeas corpus issued by this court for a consideration of the contentions of the petitioner is hereby quashed, and it is ordered that the petitioner be remanded to the custody of the Sheriff of Ramsey County to be returned to the Ramsey County jail so that he may promptly press for a determination by the county justice of whether a public offense was committed and whether there is sufficient cause to believe the petitioner guilty thereof.

PAULSON, and STRUTZ, JJ., concur.

KNUDSON, Judge (concurring specially).

I concur in the result reached by the majority, but for different reasons.

The question before this Court is whether the sheriff of Ramsey County has lawful custody of Fournier under a legal and valid commitment by the county justice as committing magistrate.

Before entering into a discussion of the questions raised, we should consider the scope of inquiry and rules which must be applied in determination of an application for a writ of habeas corpus.

It is well settled in this state that the writ of habeas corpus can be invoked only when the person is confined without jurisdiction. State ex rel. Neville v. Overby, 54 N.D. 295, 209 N.W. 552, 554 (1926).

We have said in State ex rel. Styles v. Baeverstad, 12 N.D. 527, 97 N.W. 548, 549 (1903), that a finding by a committing mag-

istrate is conclusive against collateral attack by habeas corpus.

> The examination of offenders is intrusted to magistrates, whose jurisdiction is defined and limited by the statute. The function exercised by the magistrate in such examination is a judicial one, and the finding and determination made by him, if the statutory bounds and requirements have been observed and followed, is entitled to the same respect and is of the same binding force as against collateral attack by habeas corpus as is the judgment of a court of general jurisdiction. * * *

State ex rel. Styles v. Baeverstad, supra, at 549.

> In order to render a judgment immune from attack on habeas corpus, the court must have had not only jurisdiction of the subject matter and of the person of the defendant, but also to render the particular judgment in question. * * *

State ex rel. Styles v. Baeverstad, supra, Syllabus 5.

The scope of the inquiry is limited to questions of jurisdiction, and the inquiry made by this Court of the acts of the trial court are only to determine whether it acted within its jurisdiction.

> The jurisdiction of a committing magistrate may be put in issue by proceedings in habeas corpus, and the petitioner may be discharged if it appears that the magistrate had no authority to issue the commitment * * *. The court, however, is limited to a review of such proceedings before the magistrate as relate to jurisdiction; and the writ does not lie for mere error which may be corrected by appeal or for defects in the form of the commitment. * * *

39 Am.Jur.2d Habeas Corpus, § 37.

> The inquiry on a writ of habeas corpus is addressed, not to errors committed by a court within its jurisdiction, but to the question whether the proceedings or judgment under which the petitioner is restrained are void. Ordinarily, such an inquiry involves no questions other than those that pertain to jurisdiction. The function of a writ of habeas corpus in permitting the petitioner to challenge by collateral attack the jurisdiction under which the process or judgment of which he is deprived of his liberty was issued or rendered cannot be distorted by extending the inquiry to mere errors of trial courts acting within their jurisdiction.

39 Am.Jur.2d Habeas Corpus § 11 (1968).

> Where relief is sought from a criminal judgment through habeas corpus, the scope of inquiry is limited to questions of jurisdiction and we inquire into the correctness of the acts of the trial court only to the extent of determining whether it acted within its jurisdiction. (citations omitted)

Davis v. Riedman, 114 N.W.2d 881, 882 (N.D.1962), citing 39 C.J.S. Habeas Corpus § 26a (3).

> It is well settled in this State that a writ of habeas corpus cannot be utilized as a substitute for an appeal. The inquiry in this proceeding is limited to questions of jurisdiction and we may only inquire into the correctness of the acts of the court to the extent of determining whether it acted within its jurisdiction. State ex rel. Smith v. Lee, Warden, 53 N.D. 86, 205 N.W. 314; State v. Floyd, 22 N.D. 183, 132 N.W. 662; In re Solberg, 52 N.D. 518, 203 N.W. 898; State v. Barnes, 29 N.D. 164, 150 N.W. 557, Ann. Cas. 1917C, 762; State ex rel. Styles v. Baeverstad, 12 N.D. 527, 97 N.W. 548; State ex rel. Neville v. Overby, 54 N.D. 295, 209 N.W. 552; Cook v. State, 54 N.D. 178, 208 N.W. 977; In re Cook, 54 N.D. 193, 209 N.W. 231; Ryan v. Nygaard, 70 N.D. 687, 297 N.W. 694; Secs. 32–2202 and 32–2217, R.C.N.D. 1943.

Mazakahomni v. State, 75 N.D. 73, 25 N.W.2d 772, cert. denied 333 U.S. 857, 68 S.Ct. 727, 92 L.Ed. 1137.

With these well known principles in mind, we will consider the question presented in this proceeding.

A county justice has jurisdiction to act as committing magistrate (N.D.C.C. § 29–01–15) when the defendant is brought before a magistrate (N.D.C.C. § 29–07–01), and if the defendant does not waive examination, the magistrate shall proceed to try the case (N.D.C.C. § 29–07–05). If the offense is bailable and the defendant is admitted to bail, but bail has not been taken, the defendant must be committed until bail is given (N.D.C.C. §§ 29–07–23 to –25).

The county justice has authority to issue a commitment on adjournment of the preliminary hearing for further examination (N.D.C.C. § 29–07–08 and § 29–07–09), as was done in this case, and to reissue the commitment upon the completion of taking testimony at the preliminary examination in this case (N.D.C.C. § 29–27–23 to –25).

From the foregoing it is unquestionable that the county justice had jurisdiction to act as committing magistrate before whom an accused must be brought for preliminary examination on a charge of having committed a public offense (N.D.C.C. § 29–07–01).

We come now to the question whether the jurisdiction of the justice court as a committing magistrate over the person of Fournier was impaired because of the alleged illegal arrest of him on an Indian reservation for an offense committed by him off the reservation.

In State ex rel. Styles v. Baeverstad, 12 N.D. 527, 531–2, 97 N.W. 548, 549 (1903), we said that the inquiry upon habeas corpus will extend no further than to ascertain whether the court issuing the process under which the prisoner is detained had jurisdiction of the case and acted within that jurisdiction in issuing the process.

Upon habeas corpus the court ordinarily will inquire no further than to ascertain whether the court or officer issuing the process on which the prisoner is detained had jurisdiction of the case, and acted within that jurisdiction in issuing the process. Church on Habeas Corpus, § 233; Cooley's Const. Lim. 430; note to Koepke v. Hill, 87 Am.St.Rep. 172. Mere errors or irregularities of procedure, not affecting the question of jurisdiction, are never reviewable on habeas corpus; and, where the process is regular and valid upon its face, the inquiry will go only to the question of jurisdiction. Church on Habeas Corpus, § 236. The statutes of this state do not change or enlarge the function of the habeas corpus remedy. Under it the investigation must be confined to jurisdictional matters. The jurisdictional inquiry, however, will extend to the power of the court or magistrate to make the commitment. Jurisdiction to make the judgment or order is as essential as is jurisdiction of the person and of the subject-matter. [citations omitted] In State v. Losby (Wis.) 90 N.W. 188, it is said: "In reviewing the proceedings of officers exercising quasi judicial powers the function of the writ extends to keeping them within their jurisdiction, as well as reviewing matters of original jurisdiction. * * *"

The court went on to say what inquiry the court should make in determining whether the court acted within its jurisdiction:

It can examine the evidence only sufficiently to discover whether there was any substantial ground for the exercise of judgment by the committing magistrate. It cannot go beyond that, and weigh the evidence. It can say whether the evidence rendered the charge against the prisoner within reasonable probabilities. That is all. When it has discovered that there was competent evidence for the judicial mind of the examining magistrate to act upon in determining the existence of the essential facts, it has reached the limit of its jurisdiction on that point. If the examining magistrate acts without evidence, he exceeds his jurisdiction; but any act, upon evidence worthy of consideration in any respect,

is as well within his jurisdiction when he decides wrong as when he decides right.

State ex rel. Styles v. Baeverstad, 97 N.W. at 550.

The court then examined the evidence taken before the committing magistrate and found that there was evidence to support the finding: first, that an offense was committed, and, second, that there was cause to believe that the accused committed it. "This being true, the justice acted within his jurisdiction, and his finding is beyond review in this form of procedure."

Fournier alleges that his arrest was illegal because the Ramsey County deputy sheriff was out of his bailiwick, the Indian reservation being in Benson County, and he had no authority to make the arrest; and that the Ramsey County deputy sheriff had no authority to make an arrest of an Indian on an Indian reservation for an offense committed off the reservation. It is immaterial whether the arrest of Fournier was legal or illegal. The manner in which a person accused of a crime was produced in the jurisdiction where he is charged is not jurisdictional, does not impair the jurisdiction of the court, and the jurisdiction of the court cannot be attacked in a habeas corpus proceeding where he is held by the sheriff under a commitment issued by a court having jurisdiction of the subject matter and of his person.

A person accused of a crime and produced in the jurisdiction where he is so charged and held under processes legally issued from a Court of that jurisdiction cannot attack the jurisdiction of the Court nor its right to try him because of the manner in which he was produced before that Court. It makes no difference whether it be by force, kidnapping, illegal arrest, abduction, or faulty, incomplete or irregular extradition proceedings.

Dudley v. Corbett, 46 Misc.2d 205, 259 N.Y.S.2d 572, 576–577 (1965), citing Frisbie v. Collins, 342 U.S. 519, 72 S.Ct.

509, 96 L.Ed. 541; and Ker v. People of State of Illinois, 119 U.S. 436, 7 S.Ct. 225, 30 L.Ed. 421.

In Frisbie v. Collins the United States Supreme Court said that the power of a court to try a person for crime is not impaired by the fact that he had been brought within the court's jurisdiction by reason of a forcible abduction.

This Court has never departed from the rule announced in Ker v. People of State of Illinois, 119 U.S. 436, 444, 7 S.Ct. 225, 229, 30 L.Ed. 421, that the power of a court to try a person for crime is not impaired by the fact that he had been brought within the court's jurisdiction by reason of a "forcible abduction." No persuasive reasons are now presented to justify overruling this line of cases. They rest on the sound basis that due process of law is satisfied when one present in court is convicted of crime after having been fairly apprized of the charges against him and after a fair trial in accordance with constitutional procedural safeguards. There is nothing in the Constitution that requires a court to permit a guilty person rightfully convicted to escape justice because he was brought to trial against his will.

Frisbie v. Collins, 342 U.S. 519, 522, 72 S.Ct. 509, 511–512, 96 L.Ed. 541.

Frisbie v. Collins has been followed in subsequent decisions of the federal circuit courts holding that an illegal arrest does not impair the jurisdiction of the court.

In Hobson v. Crouse the court said:

It may be that petitioner has further state remedies which he may be required to exhaust before coming to the Federal court, but we prefer to place affirmance on the firmly established rule of Frisbie v. Collins, ibid, to the effect that "* * * the power of a court to try a person for crime is not impaired by the fact that he had been brought within the court's jurisdiction by reason of a 'forcible abduction' * * *;" and, that "* * *

due process of law is satisfied when one present in court is convicted of crime after having been fairly apprised of the charges against him and after a fair trial in accordance with constitutional procedural safeguards."

Hobson v. Crouse, 332 F.2d 561 (10 Cir. 1964).

And in McCord v. Henderson the court quoted from Frisbie v. Collins:

"[T]he power of a court to try a person for crime is not impaired by the fact that he had been brought within the court's jurisdiction by reason of a 'forcible abduction.'" Frisbie v. Collins, 342 U.S. 519, 522, 72 S.Ct. 509, 511, 96 L.Ed. 541 (1952).

McCord v. Henderson, 384 F.2d 135, 136 (6 Cir. 1967).

And in Keegan v. United States the court said:

Appellant's counsel first attacks the lawfulness of the arrest. Standing alone, this is not a ground for reversal. Frisbie v. Collins, 1952, 342 U.S. 519, 72 S.Ct. 509, 96 L.Ed. 541; * * *.

Keegan v. United States, 385 F.2d 260, 264 (9 Cir. 1967).

In Fay v. Noia a state prisoner made application for a writ of habeas corpus on the ground that he had been deprived of his constitutional rights because he had been convicted on the basis of a coerced confession. The federal district court dismissed the application and the prisoner appealed. The court of appeals reversed the judgment and ordered that the prisoner's conviction be set aside and that he be discharged from custody unless given a new trial. The state prison warden, and others, brought certiorari. The United States Supreme Court affirmed the court of appeals, the court holding that Noia may be granted federal habeas corpus relief from imprisonment under a New York conviction resting upon a coerced confession obtained from him in violation of the 14th amendment, and had been deprived of his liberty without due process of law.

The Supreme Court enunciated several principles of the writ of habeas corpus which we believe are germane to the Fournier case.

Although in form the Great Writ is simply a mode of procedure, its history is inextricably intertwined with the growth of fundamental rights of personal liberty. For its function has been to provide a prompt and efficacious remedy for whatever society deems to be intolerable restraints. Its root principle is that in a civilized society, government must always be accountable to the judiciary for a man's imprisonment: if the imprisonment cannot be shown to conform with the fundamental requirements of law, the individual is entitled to his immediate release. * * *

Fay v. Noia, 372 U.S. 391, 401–402, 83 S.Ct. 822, 828–829, 9 L.Ed. 837.

Nor is it true that a common law habeas corpus was available only to inquire into the jurisdiction, in a narrow sense, of the committing court.

Fay v. Noia, supra, at 830.

If the commitment be against law, as being made by one who had no jurisdiction of the cause, or for a matter for which by law no man ought to be punished, the courts are to discharge him * * *; and the commitment is liable to the same objection where the cause is so loosely set forth, that the court cannot adjudge whether it were a reasonable ground of imprisonment or not.

Fay v. Noia, supra, at 830.

The course of decisions of this Court from Lange and Siebold to the present make plain that restraints contrary to our fundamental law, the Constitution, may be challenged on federal habeas corpus even though imposed pursuant to the conviction of a federal court of competent jurisdiction.

The same principles have consistently been applied in cases of state prisoners

seeking habeas corpus in the federal courts * * *.

Fay v. Noia, supra, at 832–833.

Fay v. Noia may be summarized to say that federal habeas corpus will be granted to release a state prisoner from imprisonment under a state conviction resting upon a coerced confession obtained from him in violation of the 14th amendment denying him due process of law, even when he has failed to appeal from his conviction when to do so may subject him to a greater penalty than that originally imposed.

We are of the opinion that Fay v. Noia is not relevant to this case because the detention of Fournier by the sheriff of Ramsey County under a commitment from the Ramsey County justice of the peace does not violate any of Fournier's constitutional rights of due process of law under the 14th amendment.

There is nothing in the Constitution or laws of the United States exempting an offender, brought before the courts of a state for an offense against its laws, from trial and punishment, even though he was brought from another state by unlawful violence or abuse of legal process.

Therefore, in accordance with the general rule stated supra § 144, to the effect that a court will not inquire into the manner in which accused is brought before it, the fact that accused has been illegally arrested, or that he has by trickery, force, fraud, or without legal authority, or by any illegal means, been brought within the territorial jurisdiction of a state or federal court, does not oust the jurisdiction of that court, and this has been held true even though the Federal Kidnapping Act was thereby violated. Even if in any case there should be a conflict of jurisdiction between two courts, accused, who is before one court for trial, cannot take advantage of the fact that his presence has been illegally or improperly obtained.

22 C.J.S. Criminal Law § 146, at 391–392 (1961).

In Hobson v. Crouse, 332 F.2d 561 (10 Cir. 1964), in response to the argument of counsel that "under the expanded concept of due process and the availability of habeas corpus to vouchsafe it under the Fourteenth Amendment, we should overrule Frisbie v. Collins and grant the writ." the Court held that *Noia* did not apply, saying, "We can find nothing in Mapp v. Ohio, ibid [367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed. 1081] or Fay v. Noia, 372 U.S. 391, 83 S.Ct. 822, 9 L:Ed.2d 837, which impels us to take the bold step suggested by counsel."

In Hobson v. Crouse the prisoner applied to the federal district court for a writ of habeas corpus seeking to annul the state imposed sentence on the grounds of having been forcibly brought into the state for trial, his conviction violated due process of the 14th amendment. The trial court discharged the writ on the ground, among others, that unlawful extradition from the state of North Carolina into the state of Kansas was not such a denial of due process as to deprive the sentencing court of jurisdiction to accept a plea of guilty, citing Frisbie v. Collins.

In Bistram v. United States, 253 F.2d 610 (8 Cir. 1958), the prisoner contended that he was denied his constitutional rights and due process guaranteed by the 4th, 5th, 6th and 14th amendments to the Constitution. He contended that the officers who took him from the Nebraska jail did not have a warrant for his arrest; that, therefore, his arrest was illegal, and the federal district court of North Dakota which tried and sentenced him to prison lacked jurisdiction of his person; that this want of jurisdiction rendered the proceedings void and, therefore, the sentence must be vacated.

The court held:

For an equally cogent reason, appellant's contention must be disallowed. It has long been a firmly entrenched prin-

ciple of federal jurisprudence that if the accused is personally before a court having jurisdiction of the subject matter, that court has jurisdiction over the accused regardless of how he was brought into the presence of the Court. * * *

Bistram v. United States, 253 F.2d 610, 612 (8 Cir. 1958), citing Frisbie v. Collins, 342 U.S. 519, 72 S.Ct. 509, 96 L.Ed. 541 (1952).

Fournier also argues that his arrest was illegal because he was arrested and removed from the reservation in violation of an extradition provision in the Devils Lake Sioux Tribal Code, and, therefore, he argues that the state should have applied to the tribal council to have him delivered to the state authorities under this provision of the Tribal Code, which reads as follows:

[Section] 1.2(d) With respect to any of the offenses enumerated in Chapter IV [Chapter IX] over which Federal or State courts may have lawful jurisdiction, the jurisdiction of the Devils Lake Tribal Court shall be concurrent and not exclusive. It shall be the duty of the said Devils Lake Tribal Court to order delivery to the proper authorities of the Federal or State government or of any other tribe or reservation for prosecution any offender, there to be dealt with according to law or regulations authorized by law, where such authorities consent to exercise jurisdiction lawfully vested in them over the said offender.

The Devils Lake Sioux Tribal Code of Justice relates to offenses committed on the reservation over which the federal or state courts may have lawful jurisdiction when the federal or state governments have assumed jurisdiction over the same offenses, and in respect to those offenses the jurisdiction of the Devils Lake tribal court shall be concurrent and not exclusive. This section does not relate to offenses committed by Indians off the reservation; it relates to offenses committed by Indians on the reservation only. The section then provides that when the federal or state authorities have consented to assume jurisdiction over those offenses (committed by Indians on the reservation) it shall be the duty of the tribal court to order delivery of any offender to the proper authorities of the federal or state government or any other tribe or reservation for prosecution.

The provision of the code is not an extradition statute; it provides that the tribal court shall have concurrent jurisdiction with federal or state courts when the federal or state courts have consented to assume jurisdiction over those offenses enumerated in chapter IX of the Tribal Code. It is unlike the code of the Navajo Indian reservation in Arizona, cited in the case of In the Matter of the Application for a Writ of Habeas Corpus of Wayne Turtle, Sr., in the United States district court for the district of Arizona.

The Devils Lake Sioux Tribal Code of Justice differs materially from the resolution of the Navajo tribal council providing for the extradition of alleged criminals from and to the Navajo reservation. The Navajo resolution provides that when an Indian has committed a crime outside of Indian country in Arizona, New Mexico or Utah, and is present on the Navajo reservation, he may be apprehended by the Navajo police and delivered to the proper state authorities in the manner and according to the procedures provided for in that resolution.

The resolution of the Navajo tribal council relating to extradition of alleged criminals from and to the Navajo reservation reads as follows:

1. Whenever the Chairman of the Navajo Tribal Council is informed and believes that an Indian has committed a crime outside of Indian country in Arizona, New Mexico, or Utah and is present on the Navajo Reservation using it as an asylum from prosecution by the State, the Chairman may order any Navajo Policeman to apprehend such Indian and deliver him to the proper State authorities at the Reservation boundary.

2. If any person, being arrested as provided in the preceding paragraph so demands, he shall be taken by the arresting policeman to the nearest Navajo Court of Indian Offenses, where the Judge shall hold a hearing and if it appears that there is no probable cause to believe the Indian guilty of the crime with which he is charged off the Reservation, or if it appears that the Indian will probably not receive a fair trial in the State Court, the Judge shall order the Indian released from custody.

3. The Secretary of the Interior is respectfully urged to request legislation from Congress authorizing the Navajo Tribe to enter into extradition agreements with States to provide for delivery of Indian fugitives present on the Reservation to proper State authorities, and of Indian fugitives off the Reservation to proper Navajo authorities.

As the writ was granted in the *Turtle* case without written opinion, we do not know the reasons of the court for granting the writ. However, the Fournier case may be distinguished from the *Turtle* case on the facts. In the Fournier case, Fournier was committed to the custody of the sheriff by a court of competent jurisdiction; whereas, in the *Turtle* case, Turtle was held under an extradition order of the Governor.

The question of the rights of an accused held under an extradition order of an executive officer of the state is not before us, and we will not discuss the question.

However, it has been held that the apprehension and arrest of an accused in violation of extradition proceedings does not deprive the court of jurisdiction of the defendant's person. Ker v. People of State of Illinois, 119 U.S. 436, 7 S.Ct. 225, 30 L.Ed. 421 (1886), and Frisbie v. Collins, supra.

We have found no citations wherein an illegal arrest has been held to be a violation of the due process clause of the 14th amendment to impair the court of jurisdiction.

Fournier was personally present in court, and under the foregoing authorities the county justice, as committing magistrate, had jurisdiction over the person of Fournier.

Here the county justice had jurisdiction of the subject matter, since the complaint charged a crime, and as county justice ex-officio a committing magistrate, he was authorized to require and accept bail or to commit the defendant to the custody of the sheriff, and of the person, as Fournier was personally present in court, and it had the power to make the commitment in this case.

Therefore, as I am of the opinion that Fournier was in the lawful custody of the sheriff of Ramsey County under a legal and valid commitment of the county justice as committing magistrate I would quash the writ of habeas corpus.

TEIGEN, Chief Justice (concurring specially on result and dissenting).

I concur with the majority that the petitioner has not shown grounds for release from custody if habeas corpus was available for the purpose of testing the legality of the arrest. I do not agree with the majority when they hold that habeas corpus is an appropriate remedy to review the legality of the custody under a commitment by a magistrate, on grounds that the arresting officer was without jurisdiction to make the initial arrest.

The petitioner, after his arrest, which he claims was unlawful, was brought before the committing magistrate charged with a public offense. The committing magistrate found that the offense with which the petitioner was charged was a bailable offense and proceeded to set bail. However, bail was not taken and the petitioner was committed to the custody of the sheriff until bail is taken. There was also a preliminary hearing at which evidence on the question of probable cause was adduced and this question was taken under advisement. A few days later, and before the magistrate ruled on probable cause, the petitioner obtained a writ of habeas corpus

from the district court. This writ being a superior authority, the original restraint, by virtue of the commitment until bail, was suspended. The petitioner was thereafter held under and by virtue of the writ itself and not under the commitment by which he was originally imprisoned. 39 C.J.S. Habeas Corpus, Sec. 87, p. 650. Apparently, for this reason, the magistrate has not acted upon the question of probable cause.

The purpose of petitioner's proceeding by habeas corpus is to test the legality of his commitment on the ground that the arrest was unlawful. Judge Knudson, in his special concurrence, has cited ample authority establishing that the power of the court is not impaired by the fact that a person charged has been brought within the court's jurisdiction as a result of an unlawful arrest. The majority rely on the federal case of Fay v. Noia, cited in the majority opinion. However, for reasons plainly and adequately pointed out by Judge Knudson, this case is not applicable to the issue before us. Thus the majority, in my opinion, have expanded upon the scope of the inquiry in habeas corpus as announced in Fay v. Noia and applied it to test the jurisdiction of the court over the person on the ground of the alleged unlawfulness of the arrest, on the assumption that when and if the United States Supreme Court reaches this question it will so hold where a federal question is involved. I am not willing to speculate on what the United States Supreme Court may hold when and if the question before us is presented to them for decision. Secondly, I do not feel federal decisions on procedure govern state procedure. Habeas corpus is a mode of procedure and is defined by statute in this state. Chapter 32–22, N.D.C.C. However, habeas corpus is not defined by federal statutes and the federal courts must look to the common law for the meaning, purpose, and extent of the power conferred. 25 Am.Jur. Habeas Corpus, Sec. 7, p. 148. In this state there is no common law where the law is established by statute. Sec. 1–01–06, N.D.C.C. The statutes declare the purpose and

extent of the inquiry permitted in habeas corpus proceedings in this state; therefore, we are not at liberty to apply the common law. Secs. 32–22–01, 32–22–02, & 32–22–17, N.D.C.C.

I would quash the writ for the reasons stated herein.